IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KELLY VLASVICH and CHRIS VLASVICH, | |
| Plaintiffs, | |
| vs. | File No. |
| C.R. BARD, INC., a New Jersey corporation, and BARD PERIPHERAL VASCULAR, INC., (a subsidiary and/or division of defendant C.R. BARD, INC.), an Arizona corporation, | **JURY DEMAND** |
| Defendants. | |

**COMPLAINT AT LAW**

NOW COME the Plaintiffs, KELLY VLASVICH & CHRIS VLASVICH, by their attorneys, JIM NAVARRE and MOSSING & NAVARRE, LLC and complaining of the Defendants, C.R. BARD INC. and BARD PERIPHERAL VASCULAR, INC., a subsidiary corporation and/or division of C.R. BARD, INC., state as follows:

**INTRODUCTION**

1. At all times relevant herein, the Defendant, C.R. BARD, INC., was conducting business in the State of Illinois. C.R. BARD, INC. is a corporation based out of New Jersey, with its corporate headquarters located at 730 Central Avenue, Murray Hill, New Jersey. Defendant conducts substantial business and is subject to personal jurisdiction in Cook County and throughout the jurisdiction served by this Court.

2. At all times relevant herein, the Defendant, BARD PERIPHERAL VASCULAR, INC. was conducting business in the State of Illinois. BARD PERIPHERAL VASCULAR, INC. is a subsidiary division of C.R. BARD, INC., with its headquarters located at 1625 West 3rd

1

Street, Tempe, Arizona. Defendant conducts substantial business and is subject to personal jurisdiction in Cook County and throughout the jurisdiction served by this Court.

3. Plaintiffs KELLY VLASVICH and CHRIS VLASVICH are residents and citizens of Illinois.

4. Jurisdiction of this Court is based on Diversity of Citizenship and the amount in controversy is well in excess of the jurisdictional limit of $75,000. 28 U.S.C. Section 1332 (a)(1).

5. On or about February 10, 2009, KELLY VLASVICH underwent surgery in Illinois to insert a Bard G2 inferior vena cava filter, or "IVC filter."

6. On or about December 14, 2011, KELLY VLASVICH was admitted to the hospital for moderate chest pain and discomfort that had gradually worsened over several days. Her symptoms included nausea, vomiting, sweating, difficulty breathing, cough, weakness and dizziness.

7. On or about December 16, 2011, KELLY VLASVICH was diagnosed with cardiac tamponade/pericarditis. At this time, Plaintiff underwent a pericardiocentesis.

8. On or about December 21, 2011, after continued chest discomfort, KELLY VLASVICH underwent a CT scan which showed metallic fragments in the right ventricle of the heart and in the right lung which were determined to be "spokes" that had broken off from the defective IVC filter. On or about this date, KELLY VLASVICH discovered that the Defendant's IVC filter was defective. Upon review of images of the abdomen, the IVC filter only had nine struts when it originally had twelve.

9. On or about December 22, 2011, to save her life, KELLY VLASVICH underwent open heart surgery for removal of the G2 IVC filter strut from the right ventricle of her heart. It

was determined that the two remaining fractured struts in her lungs should not be touched, because removing them would be too dangerous.

10. On or about December 27, 2011, KELLY VLASVICH was transferred to Barnes-Jewish Hospital in St. Louis, in need of a higher level of care.

11. On or about December 30, 2011, KELLY VLASVICH underwent an exploratory laparotomy and open surgical removal of the IVC filter.

12. KELLY VLASVICH has ongoing permanent pain and suffering due to defendant's defective IVC filter.

13. KELLY VLASVICH has permanent and extensive disfigurement due to defendant's defective IVC filter.

14. The two fractured struts from defendant's IVC filter are permanently lodged in Kelly's lungs.

## IVC FILTERS OVERVIEW

15. The IVC filter at issue in this case is a trademarked "G2" filter or "G2 Filter System." The G2 Filter System (hereafter "G2" or "G2 Filter") was designed, manufactured, marketed, and sold by defendants, C.R. BARD, INC. and/or BARD PERIPHERAL VASCULAR, INC., and continues to be manufactured and sold by the defendants throughout the United States and abroad.

16. An IVC filter is a device that is designed to filter or "catch" blood clots (called "thrombi") that travel from the lower portions of the body to the heart and lungs. IVC filters are designed to be implanted within the inferior vena cava.

17. IVC filters have been on the market for decades. The first IVC filter was introduced in the late 1960s. Since then, the market has been supplemented with all types and designs of filters offered by various manufacturers.

18. Over the years, an IVC filter was designed and manufactured so that is could be retrieved from the human body. Ultimately, retrievable IVC filter designs were offered in the market. The Recovery Filter System[1] was introduced to the market in late 2002 or 2003 as an IVC filter that was able to be retrieved after an indeterminate time of placement within the human body.

## THE G2 FILTER

19. The G2 Filter is a medical device constructed of a nickel-titanium alloy (also called "Nitinol") designed to filter blood clots (thrombi) from the human circulatory system. Nitinol material is unique. Nitinol is actually an acronym that stands for Nickel Titanium Naval Ordnance Laboratory. Nitinol was developed by the Navy as a material to be used in ordnance. Nitinol possesses "shape memory." Nitinol will change shape according to changes in temperature, and then, retake its prior shape after returning to its initial temperature.

20. The design of the G2 Filter is based on its predecessor device, also designed, manufactured and sold by the defendants. The predecessor device was called the Recovery Filter System (hereafter "Recovery" or "Recovery Filter").

21. Soon after the Recovery Filter system was brought to the market, reports were made that portions of the device were fracturing and migrating to the vital organs of the patients in whom it was implanted. These reports continued to surface and were made to healthcare providers, the F.D.A., and to the defendants. As early as 2003, the defendants were aware that

---

[1] The Recovery™ Filter System is the predecessor device to the G2 Filter.

4

the Recovery Filter System was flawed and was causing injury and death to patients who had the filter implanted in their bodies.

22. The Recovery Filter System had manufacturing and design defects which caused the Recovery to experience a significant rate of fracture and migration of the device. Studies performed by members of the medical and scientific communities established that the Recovery Filter had a 21% to 31.7% rate of fracture.

23. The failure of the Recovery Filter System was, in part, because the Recovery Filter System was designed so as to be able to withstand the normal anatomical and physiological loading cycles exerted *in vivo*.

24. The Recovery Filter System had manufacturing defects, including lack of preparation of the exterior surface of the device so as to eliminate gouges in the Nitinol struts of the device. These gouges caused the Recovery Filter System to fail/fracture. The G2 Filter continues to have manufacturing defects in the form of "draw marks" on the exterior of the device.

25. Sometime after 2003, the defendants made a decision to introduce a substitute vena cava filter for Bard Peripheral Vascular's Recovery filter. This substitute vena cava filter was substantially similar to the Recovery™ Filter System, and was called G2 for "second generation."

26. In 2005, the defendants submitted an application to the F.D.A. for introduction of the G2™ Filter to the global market. The application was submitted under Section 510(k) of the United States Food, Drug and Cosmetic Act ("Act") of 1976 (21 U.S.C. 321 *et seq*). Under Section 501(k), a medical device manufacturer may represent that the device which is offered for approval is "substantially similar" to a "predicate device." The defendants represented the G2

5

Filter to the F.D.A. as being substantially similar to the Recovery Filter System (the predicate device).

27. The defendants first received approval from the F.D.A. to market the G2 Filter as a permanent placement vena cava filter. The defendants began selling the G2 in September 2005. Later, in 2008, the G2™ Filter was approved by the F.D.A. as a retrievable (optional) IVC filter.

## A COMPARISON OF THE RECOVERY FILTER SYSTEM AND THE G2 FILTER SYSTEM

28. The Recovery Filter and the G2 Filter have a strong resemblance in a number of respects. First, they are strikingly similar in appearance and have the same design for filtration. The G2 Filter has six upper struts used for device positioning and filtering, and six lower struts used for anchoring and filtering – just like its predicate, the Recovery Filter.

29. In addition, the G2 Filter is made of the same alloy material as the Recovery Filter System. They both were manufactured with Nitinol.

30. Like the Recovery Filter, the G2 Filter is inserted via catheter which is guided by a physician through a blood vessel into the inferior vena cava. Both filters are designed to be retrieved in a similar fashion.

31. Following endovascular placement of the G2 Filter, a physician typically uses imaging studies to confirm successful placement and positioning of the device within the vena cava.

32. The G2 Filter shares the same defects as its predicate. The G2 Filter's design defect causes it to be of insufficient integrity and strength to withstand normal placement within the human body. The global stressors of the respiratory and cardiac cycles of the human body cause the G2 Filter to develop stress or "fatigue" fractures of the Nitinol surface of the device.

33. Also like its predicate, the G2 Filter suffers from manufacturing defects. These manufacturing defects primarily include the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the G2 Filter while *in vivo*. In particular, the G2 Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Simply put, the G2 Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device more susceptible to fatigue failure.

34. The G2 Filter is advertised by defendants, C.R. BARD, INC. and/or BARD PERIPHERAL VASCULAR, INC., to have "enhanced fracture resistance," "improved centering," and "increased migration resistance."

35. Despite the defendants' claims concerning the safety and efficacy of the G2 Filter, the F.D.A.'s "MAUDE" (Manufacturer and User Facility Device Experience) database includes numerous reports of the failure, fracture and migration of the G2 Filter.

36. The failure (fracture and/or migration) of the G2 Filter System leads to a number of different, and potentially fatal, complications. These complications include the following: death, hemorrhage, cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart), severe and persistent pain, and perforation of tissue, vessels and organs.

## PLAINTIFF'S DAMAGES

37. The G2 Filter System was placed in Plaintiff's body on or about February 10, 2009. Plaintiff discovered that the G2 Filter System was fractured on or about December 21,

7

2011. The fractured portions of the device migrated to vital organs, including her heart and lungs, causing injury and damage. Plaintiff was caused to undergo medical treatment as a result of the failure of the G2 Filter System. Plaintiff has incurred significant medical expenses and has endured extreme pain and suffering, loss of enjoyment of life, disability, disfigurement and other losses, which are permanent in nature.

38. As a direct and proximate result of the conduct and defective product of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as alleged in this Complaint, plaintiff KELLY VLASVICH has suffered permanent and continuing injury, loss of normal life, pain, suffering, disability, disfigurement and impairment. Plaintiff has suffered emotional trauma, harm and injuries. Plaintiff's ability to carry on the affairs of her daily life has been impacted and diminished, and will continue to be diminished in the future.

39. As a direct and proximate result of the conduct and defective product of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as alleged in this Complaint, the plaintiff has incurred substantial medical expenses, and will continue to incur medical expenses in the future.

## THE DEFENDANTS' KNOWLEDGE OF THE FAILURE OF THE G2 FILTER

40. Upon information and belief, Plaintiff alleges that by 2007, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were aware and had knowledge of the fact that the G2 Filter System was defective and unreasonably dangerous and was causing injury and death to patients who had received the G2 Filter.

41. Data established that the failure rate of the G2 Filter System was/is higher than the rate the defendants have published and which defendants currently continue to publish to the medical community, members of the public, and the F.D.A.

42. The conduct of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., as alleged in this Complaint, constituted willful and wanton corporate conduct that demonstrates a conscious disregard for the safety of the plaintiff KELLY VLASVICH. The defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., had actual knowledge of the dangers presented by the G2 Filter System, yet consciously failed to act reasonably by:

   a. Informing or warning Plaintiff, her physicians, or the public at large of the dangers; and

   b. Recalling the G2 Filter System from the market in a timely and safe fashion.

43. Despite having knowledge by 2007 of the unreasonable, dangerous and defective nature of the product, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., consciously disregarded the known risks and continued to actively market and offer for sale the G2 Filter System.

44. Defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., acted in a willful and wanton manner in total disregard for the health and safety of the user or consumer of its G2 Filter System, including plaintiff KELLY VLASVICH, to serve their own financial interests. Defendants knew or had reason to know and consciously disregarded the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, and consciously pursued a course of conduct knowing that such action created a substantial risk of significant harm to other persons.

## COUNT I – NEGLIGENCE

1-44. Plaintiff repeats and realleges paragraphs one (1) through forty-four (44) of the Introduction as paragraphs one (1) through forty-four (44) of Count I as if fully set forth herein.

9

45. At all times relevant to this cause of action, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were in the business of designing, developing, manufacturing, marketing, and selling medical devices, including the G2 Filter System.

46. At all times relevant to this cause of action, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were under a duty to act reasonably to design, develop, manufacture, market, and sell a product that did not present a risk of harm or injury to the plaintiff KELLY VLASVICH and to those people receiving the G2 Filter System.

47. At the time of manufacture, marketing, and sale of the G2 Filter System, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., knew or should have known that the G2 Filter System:

    a. Was designed and manufactured in such a manner so as to present an unreasonable risk of fracture of portions of the device;

    b. Was designed and manufactured so as to present an unreasonable risk of migration of the device and/or portions of the device; and/or

    c. Was designed and manufactured to have unreasonable and insufficient strength or structural integrity to withstand normal placement within the human body.

48. Despite the aforementioned duty on the part of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC. committed one or more breaches of the duty of care and were negligent in:

    a. Unreasonably and carelessly failing to properly warn of the dangers and risks of harm associated with the G2 Filter System, including the incidence of failure of the G2 Filter System;

    b. Unreasonably and carelessly manufacturing a product, the G2 Filter System, that was insufficient in strength or structural integrity to withstand the foreseeable use of normal placement within the human body;

    c. Unreasonably and carelessly designing a product, the G2 Filter System, that was insufficient in strength or structural integrity to withstand the foreseeable use of normal placement within the human body; and

    d. Unreasonably and carelessly designing or manufacturing a product, the G2 Filter System, that presented a risk of harm to the plaintiff and others similarly situated because it was prone to failure.

49. As a direct and proximate result of the foregoing negligence by defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., the plaintiff KELLY VLASVICH suffered permanent and continuing injuries, medical expenses, lost wages, pain and suffering, disability, disfigurement/loss of normal life, and impairment. KELLY VLASVICH has suffered emotional trauma, harm and injuries that will continue into the future.

## COUNT II – BREACH OF IMPLIED WARRANTY

1-49. Plaintiff repeats and realleges paragraphs one (1) through forty-nine (49) of Count I as paragraphs one (1) through forty-nine (49) of Count II as if fully set forth herein.

50. Plaintiff, through KELLY VLASVICH's medical providers, purchased the G2 Filter System from defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC.

51. At all times relevant to this cause of action, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were merchants of goods including endovascular medical devices and vena cava filters like the G2 Filter System.

52. At the time and place of sale, distribution, and supply of the defendants' G2 Filter System to Plaintiff, defendants impliedly warranted that the G2 Filter System was safe, and impliedly warranted that the product was reasonably fit for its intended purpose and was of marketable quality. Contrary to the aforementioned implied warranties, the G2 Filter System was not reasonably fit for its intended, anticipated, or reasonably foreseeable use.

53. At the time of the plaintiff's purchase of the G2 Filter System from the defendants, it was not in a merchantable condition in that:

   a. It was designed in such a manner so as to be prone to a statistically high incidence of fracture and/or migration;

   b. It was designed in such a manner so as to result in a statistically significant incidence of injury to the organs and anatomy; and

   c. It was manufactured in such a manner so that the exterior surface of the G2 Filter System was inadequately, improperly and inappropriately prepared and/or finished causing the device to weaken and fail.

54. Additionally, implied warranties were breached in that:

   a. The defendants failed to provide the warning or instruction and/or an adequate warning or instruction which a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that said G2 Filter System would cause harm;

   b. The defendants designed, manufactured, marketed and/or sold the G2 Filter System that did not conform to representations made by the defendants, when it left the defendants' control;

   c. The defendants designed, manufactured, marketed and/or sold the G2 Filter System that was more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; and the foreseeable risks associated with the G2 Filter System's design or formulation exceeded the benefits associated with that design of formulation. These defects existed at the time the product left the defendants' control; and

   d. The defendants manufactured and/or sold the G2 Filter System that deviated in a material way from the design specifications, formulas, or performance standards or from otherwise identical units manufactured to the same design specifications, formulas, or performance standards, and these defects existed at the time the product left the defendants' control.

55. Furthermore, defendants' marketing of the G2 Filter System was false and/or misleading.

56. Plaintiff, through her attending physicians, relied on these representations in determining which IVC filter to use.

12

57. Defendants' G2 Filter System was unfit and unsafe for use as it posed an unreasonable risk of injury to persons using said product, and accordingly defendants breached the implied warranties associated with the product.

58. The foregoing warranty breaches were a substantial factor in causing plaintiff's injuries and damages as alleged.

59. As a direct and proximate result of the foregoing condition of the product of defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., plaintiff, KELLY VLASVICH suffered permanent and continuing injuries, medical expenses, lost wages, pain and suffering, disability, disfigurement, loss of normal life, and impairment. KELLY VLASVICH has suffered emotional trauma, harm and injuries that will continue into the future.

60. The Plaintiff further alleges that the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., acted willful, wanton and in total disregard for the health and safety of the user or consumer of its G2 Filter System, including plaintiff KELLY VLASVICH, acted to serve their own interests and having reason to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

**COUNT III – NEGLIGENT MISREPRESENTATION**

1-59. Plaintiff repeats and realleges paragraphs one (1) through fifty-nine (59) of Count II as paragraphs one (1) through fifty-nine (59) of Count III as if fully set forth herein.

60. At all times relevant to this cause, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., negligently provided Plaintiff, the public at large, the medical community, and/or the F.D.A. with false or incorrect information, or omitted or failed to

13

disclose material information concerning the G2 Filter System, including, but not limited to, misrepresentations relating to the following subject areas:

      a. The safety of the G2 Filter System;

      b. The efficacy of the G2 Filter System;

      c. The rate of failure of the G2 Filter System; and

      d. The approved uses of the G2 Filter System.

61. Defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., intended that Plaintiff, public at large, the medical community, and/or the F.D.A. rely on information they provided and defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., provided it for such purpose.

62. Defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., failed to exercise reasonable care or competence in obtaining or communicating the information to Plaintiff, the public at large, the medical community, and/or the F.D.A.

63. The plaintiff, the plaintiff's healthcare providers and the medical community at large relied on the misrepresentations of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., in this regard, their reliance was justified, and as a direct and proximate result, the plaintiff was damaged.

64. The plaintiff further alleges that the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., acted willful, wanton, and in total disregard for the health and safety of the user or consumer of its G2 Filter System, including Plaintiff KELLY VLASVICH. Defendants acted to serve their own interests and had reason to know and consciously disregarded the substantial risk that as a result of their negligent misrepresentations, their product may result in killing or significantly harming patients, or significantly injuring the

rights of others, and consciously pursued a course of making misrepresentations knowing that such misrepresentations created a substantial risk of significant harm to other persons.

## **COUNT IV – STRICT LIABILITY – PRODUCTS LIABILITY**

1-64. Plaintiff repeats and realleges paragraphs one (1) through sixty-four (64) of Count III as paragraphs one (1) through sixty-four (64) of Count IV as if fully set forth herein.

65. At all times relevant to this cause of action, the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., were engaged in the design, manufacture, distribution and sale of the G2 Filter System.

66. Defendants designed, manufactured, distributed and sold the G2 Filter System to medical professionals and their patients, knowing it would be used as a vena cava filter.

67. The G2 Filter System was designed, manufactured, distributed and sold by the defendants, reached Plaintiff without substantial change in its condition and was used by Plaintiff in a reasonably foreseeable and intended manner.

68. The G2 Filter System was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff, because it was dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

69. At no time did Plaintiff have reason to believe that the G2 Filter System was in a condition not suitable for its proper and intended use among patients.

70. The G2 Filter System was used in a manner for which it was intended. This use resulted in injury to Plaintiff.

71. As alleged in the preceding paragraphs, the G2 Filter System was defective due to defective design and manufacturing rendering the system unsafe.

72. The G2 Filter System was not reasonably safe due to defective design and manufacturing because the foreseeable risks of harm posed by the device were sufficiently greater than its foreseeable therapeutic benefits, such that reasonable healthcare providers, if aware of such foreseeable risks and relative lack of therapeutic benefits, would not prescribe the device for plaintiff.

73. Plaintiff was not able to discover, nor could she have discovered through the exercise of reasonable care, the defective nature of the G2 Filter System. Further, in no way could Plaintiff have known that the defendants had designed, developed, manufactured, and marketed the G2 Filter System in such a way as to make the risk of harm or injury outweigh any therapeutic benefits.

74. The G2 Filter System is defective in design and manufacturing because of its propensity to fracture and migrate; thereby placing patients at risk of death and great bodily harm.

75. The G2 Filter System is unreasonably dangerous because it was marketed and sold to Plaintiff without adequate warnings regarding the propensity of the G2 Filter System to fracture and migrate leading to life threatening injuries.

76. Defendants had knowledge and information confirming the defective and dangerous nature of the G2 Filter System.

77. Despite this knowledge and information, the defendants failed to adequately and sufficiently warn Plaintiff and her physicians that the G2 Filter System causes serious and permanent injuries including fracture of the device.

78. As a direct and proximate result of the defendants' wrongful conduct, including the defective and dangerous design, manufacture, marketing and inadequate warnings of the G2

Filter System, Plaintiff has sustained and will continue to sustain severe injuries of a permanent and lasting nature, including, but not limited to, cost of medical care, lost income, pain and suffering, permanent disfigurement, permanent disability, and loss of normal life for which she is entitled to compensatory and punitive damages.

WHEREFORE, the plaintiff, KELLY VLASVICH, requests judgment against Defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., in a sum in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus costs.

### COUNT V – LOSS OF CONSORTIUM

NOW COMES the Plaintiff, CHRIS VLASVICH, by and through his attorneys, MOSSING & NAVARRE, LLC, and complaining of the Defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., a subsidiary corporation and/or division of C.R. BARD, INC., states as follows:

1-78. Plaintiff repeats and realleges paragraphs one (1) through seventy-eight (78) of Count IV as paragraphs one (1) through seventy-eight (78) of Count V as if fully set forth herein.

79. That at all times relevant herein, the Plaintiff, CHRIS VLASVICH, was and he remains the lawful spouse of the Plaintiff, KELLY VLASVICH.

80. That as a proximate result of one or more of the foregoing acts of the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., the Plaintiff, CHRIS VLASVICH, suffered and continues to suffer a loss of society and companionship of and with his lawful wife, the Plaintiff, KELLY VLASVICH.

WHEREFORE, the Plaintiff, CHRIS VLASVICH, requests judgment against the defendants, C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., in a sum in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus costs.

## **JURY DEMAND**

The Plaintiffs, KELLY VLASVICH and CHRIS VLASVICH, hereby request a trial by jury.

                                              Respectfully Submitted,

                                              */s/ Jim P. Navarre*

Jim P. Navarre
Mossing & Navarre, LLC
30 North LaSalle Street – Suite 1524
Chicago IL 60602
(312)262-6700
Attorney #: 6216600